IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| DAS A. BORDEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| vs. | ) | |
| | ) | 94-C-1341-NE |
| JOHN D. CLEMENT, JR., | ) | |
| | ) | |
| Defendant. | ) | |

FILED
01 MAR 30 AM 8:46
U.S. DIST. COURT
N.D. OF ALABAMA

ENTERED
MAR 30 2001

**MEMORANDUM OPINION ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

In 1993, Plaintiff Das A. Borden brought this lawsuit for breach of fiduciary duty, violation of the attorney's oaths set forth in §§ 34-3-20(d) and 34-3-15 of the Code of Alabama, violation of the Alabama Rules of Professional Conduct, wantonness/malice, legal malpractice, and defamation against his former attorney, business partner and friend, John D. Clement, Jr. The case was removed from the circuit court to this Court, where it was referred to the Bankruptcy division. The Bankruptcy Court granted Defendant Clement's motion for summary judgment. The case was appealed to this Court, which affirmed the judgment.

The Eleventh Circuit Court of Appeals, in an unpublished opinion, reversed this Court, holding that 1) while there is federal subject matter jurisdiction over this action, 2) the case is not a "core proceeding" under 28 U.S.C. § 157; thus, the Bankruptcy Court was

1

67

now empowered to enter summary judgment. The case was remanded with instructions that this Court "itself decide the lawsuit." *In re Das A. Borden*, No. 97-6824, slip op. at 11 (11th Cir. Apr. 21, 1999).

On remand, Clement renewed his motion for summary judgment. Finding the issue to be genuinely disputed whether Clement was Borden's personal lawyer at the time of the alleged malpractice, the Court initially denied the motion. Clement then filed a renewed motion, raising the defense of statute of limitations on the legal malpractice claim and asserting qualified privilege on the defamation claim.

For the reasons that follow, the Court finds that based on the undisputed facts, Borden's legal malpractice claim is barred by the statute of limitations. It further concludes that Borden's defamation claim is barred by absolute and conditional privilege. All other claims are not authorized by Alabama law.

## I. The Undisputed Facts

Since the early sixties, Clement has been Borden's friend, business partner, and personal lawyer. Clement is the godfather to Borden's daughter. They have been partners in numerous business ventures. Borden rented office space in a building owned jointly by Clement and Borden's wife. At least until the time this lawsuit was filed, Borden lived in a lake house owned by Clement. Clement was a shareholder, officer and attorney of Shangrila, Inc., which Borden owned. When Shangrila was unable to make payments on 110 acres of Colbert County land, Clement bought the land.

Clement was Borden's personal lawyer for all relevant periods until November of

1991. Between 1985 and 1988, Borden and his companies paid over $500,000 to Clement in legal fees.

Borden has been involved in various aspects of the real estate industry for over three decades. In 1972, he formed Das A. Borden & Company ("DABCO") to pursue opportunities in the real estate syndication business. As a syndicator, DABCO arranged for a number of investors to purchase "subscriptions" in a limited partnership formed by investors, DABCO, and Borden individually. Borden acted as the managing general partner of these limited partnerships. Through subscriptions, DABCO raised capital for the purchase of property (such as an apartment complex), which would then enter into a management contract with DABCO. DABCO received substantial fees for its management services. The investors received accelerated depreciation deductions, which resulted in favorable income tax treatment for all involved. In 1986, the Internal Revenue Code was changed to generally disallow the deduction against ordinary income of real estate losses. At the time of this change, DABCO had syndicated and was managing sixty-seven limited partnership real estate properties.

Clement represented DABCO from its inception through the operative events in this case.

In 1984, after Borden and DABCO's lines of credit at First United Bank ("First United") (Meridian, Mississippi) had been exhausted, Borden arranged with Alabama businessman-investor Ed Leigh McMillan to secure a $3 million line of credit with AmSouth Bank of Mobile, Alabama. McMillan acted as guarantor for the AmSouth line of credit and

3

provided other letters of credit. In return, McMillan received ten percent (10%) of DABCO's stock. Borden's indebtedness to First United was secured by his DABCO stock.

The Borden-DABCO real estate investments began to experience cash-flow problems in the mid-eighties, and their troubles were multiplied by the 1986 change in the tax laws. In response, Borden formed Borden Companies, Inc. ("BCI") in 1986 as a vehicle to change the nature of DABCO's business. All of DABCO's stock was transferred to BCI, with McMillan's consent. McMillan was given a million shares of BCI in exchange for his ten percent (10%) interest in DABCO.

In April of 1988, three creditors filed an involuntary petition for Chapter 7 (Liquidation) personal bankruptcy against Borden individually. DABCO voluntarily filed for Chapter 11 (Reorganization) bankruptcy on July 8, 1988. Bankruptcy Case No. ("BC#") 88-6467. Borden's personal bankruptcy was converted to a Chapter 11 bankruptcy on July 12, 1988. BC#. 88-3764. Kyle Weems represented Borden in his individual bankruptcy case at the times relevant to this case. At Borden's urging, Clement was appointed and acted as counsel for DABCO in BC# 88-6467.

Beginning in 1989, friction developed and escalated between Borden and McMillan. McMillan purchased the note held by First United, and he thereafter attempted to take control of BCI and DABCO. The dispute came to a head in two adversary proceedings in the Bankruptcy Court: a declaratory judgment action against Borden and DABCO by McMillan and an injunction action against McMillan by Borden and DABCO. Clement represented DABCO in these proceedings. He continued to serve as Borden's personal

4

attorney.

In July of 1991, Borden, DABCO and McMillan reached a tentative settlement of their dispute via a Settlement and Restructure Agreement. Under that agreement, Borden retained *de facto* control of DABCO. He would operate under an employment contract with BCI, but he could be terminated for cause, including "[f]raud, gross mismanagement, dishonesty, and other similar matters." McMillan was obligated to infuse new capital into DABCO for the principal purpose of curing defaults on certain partnerships financed by the United States Department of Housing and Urban Development ("HUD"), and McMillan agreed to loan Borden $348,642 to fund a settlement of his federal income tax liability. The Settlement and Restructure Agreement was signed by McMillan's attorney, David Anderson, of the law firm of Cabiness & Johnston; Clement acted as DABCO's attorney; and Weems acted as Borden's attorney.

Despite the apparent rapprochement between Borden and McMillan, HUD moved to lift the bankruptcy stay so that it could proceed with foreclosure of some of DABCO and Borden's defaulted properties. The Bankruptcy Court set a hearing on this motion for October 9, 1991.

On an unspecified day in September of 1991, Borden and Clement had breakfast at a restaurant in Muscle Shoals. Borden accused Clement of acquiring his ex-wife's 50% partnership interest in certain investment real estate at less than a fair price. Clement was angered over the accusation and "stormed" out of the restaurant. For the next few weeks, Borden tried to meet with Clement so they could resolve their differences. (Borden Aff. of

5

7/22/99, at 2.) Clement did not return Borden's telephone calls.

Jane Springer, DABCO's long-term Vice President, Secretary and Treasurer, was in charge of preparing Borden for his testimony as DABCO's corporate representative at the October 9, 1991, hearing.[1] On October 7, 1991, Borden asked Springer to retrieve a copy of a letter in the adjacent office of Lonnie Flippo, an accountant Borden had hired recently. In searching for the letter, Springer discovered other documents that aroused her suspicion that Borden and Flippo were engaged in a conspiracy to defraud DABCO and its creditors. Springer telephoned Clement and related to him the notes and her suspicions.

On October 8, 1991, she met with Clement and gave him a copy of the Flippo notes. She and Clement agreed that the notes should be turned over to Anderson. On the same day, Clement talked with Weems, Borden's attorney in his personal bankruptcy case, about the notes. Weems advised Clement that the notes should be turned over to Anderson as the attorney for the largest creditor of DABCO.

---

[1] According to the attorney for Borden's personal bankruptcy case, who occasionally worked out of DABCO's offices:

> Jane Springer supervised everything at that company. She was the repository of all historical knowledge. She did everything. She knew Das Borden and Das Borden & Company inside and out. And anytime you wanted a fact question answered, you would go to Jane Springer.
> So she had control of the books. She supervised the office. Das Borden had delegated responsibility for day-to-day operations to her.

(Weems Depo., p. 180.)

On October 9, 1991,[2] Clement and Springer met with Anderson in a conference room of the offices of Bankruptcy Judge Breland. Clement turned over a copy of the Flippo notes to Anderson. Anderson concluded, after his review of the notes, that the documents reflected a conspiracy to defraud his client and other DABCO creditors. Anderson, Clement, and Springer then decided to confront Borden with the notes; to insist that he withdraw his participation in the conspiracy; and to seek medical attention for his problem with alcohol.

A meeting was held at 11:00 AM on November 1, 1991, in Anderson's law offices. In an inebriated state, Borden appeared. Springer and Clement were also in attendance. Anderson displayed the Flippo notes to Borden and asked "what they were and what they meant." (Borden Aff. of 7/22/99, at 4.) Borden reviewed the notes and disclaimed any knowledge of them. Springer then stated to him that she had found the notes in Flippo's office and had turned them over to Clement, who in turn, had delivered the notes to Anderson. Borden suggested that they take a lunch break and that, in the meanwhile, he would locate Flippo and bring him to the meeting after lunch. After lunch, Borden returned to the meeting with Flippo. Flippo acknowledged that the notes were his, and he proceeded to explain them. During Flippo's explanation, he was interrupted by Clement, who "announced in a loud and belligerent voice that this is a criminal conspiracy and that he was resigning as corporate lawyer." (*Id.*) Borden then declared that the meeting was over and left the room.

Though ultimately approved by the Bankruptcy Court, the Settlement and Restructure

---

[2] The scheduled court hearing was apparently continued.

Agreement was unsuccessful in salvaging DABCO and Borden.

On November 18, 1991, Clement filed in Borden's personal bankruptcy case (BC# 88-3764) a Motion to Withdraw, in which he represented that he is the "[a]ttorney for Das A. Borden, individually. . . ." As the basis for the withdrawal, he states that "[a] conflict has arisen which will prevent Movant from continuing to represent Borden." With the letter approval of Borden, the Bankruptcy Court granted Clement's motion to withdraw.

Borden filed this action against Clement on November 29, 1993.

## II. The Governing Law

Summary judgment is appropriate only where the material facts are not in dispute and the moving party is entitled to judgment as a matter of law. In passing on a summary judgment motion, all reasonable inferences from the facts must be made in favor of the party opposed to the motion. These principles of law require no citation of authorities.

Only one form and cause of action may be brought in the courts of Alabama against legal service providers: a legal service liability action ("legal malpractice"). ALA. CODE § 6-5-573. Claims for a lawyer's breach of fiduciary duty, violations of the lawyer's oath, violations of the rules of professional conduct, and wantonness in violation of a lawyer's duties are all subsumed in a legal malpractice action. *Id.* § 6-5-572. These kinds of claims may not be pursued as separate causes of action. More specifically, violation of the rules of professional conduct does not give rise to an independent cause of action, and it is inadmissible as evidence in the plaintiff's case of legal malpractice. *Id.* § 6-5-578. *Cf. Terry Cove North, Inc. v. Marr & Friedlander, P.C.*, 521 So. 2d 22, 23 (Ala. 1988).

## A. The Legal Malpractice Claim

To prove a claim of legal malpractice, a plaintiff must prove that the lawyer breached the applicable standard of care, defined as such reasonable care, skill and diligence as other similarly situated legal service providers in the same general line of practice and in the same general area ordinarily have and exercise in a like case. *Id.* § 6-5-580(1). The specific elements of a legal malpractice claim are: 1) the existence of a duty, 2) breach of the duty, 3) proximate causation of injury by the breach, and 5) damages. *Independent Stave Co., v. Bell, Richardson & Sparkman, P.A.,* 678 So. 2d 770, 772 (Ala. 1996).

A legal malpractice claim will not lie where the plaintiff has not received legal service from the defendant. *Cunningham v. Langston, Frazer, Sweet & Freese,* 727 So. 2d 800 (Ala. 1999).

A legal malpractice claim "must be commenced within two years after the act or omission or failure giving rise to the claim, and not afterwards. . . ." ALA. CODE § 6-5-574(a). The limitations period is "measured from the date of the accrual of a cause of action and not from the date of the occurrence of the act or omission." *Michael v. Beasley,* 583 So. 2d 245, 252 (Ala. 1991); *Kacher v. Taylor,* 849 F. Supp. 1503 (M.D. Ala. 1994).[3] " If the act of which the injury is the natural sequence is of itself a legal injury to plaintiff, a completed wrong, the cause of action accrues and the statue begins to run from the time

---

[3] To the extent that *Michael* and *Kacher* stand for the principle that the statute begins to run when the client sustains actual damage, they were prospectively overruled by *Ex parte Pannell,* 756 So. 2d 862 (Ala. 1999), which adopts the occurrence rule—that the statute of limitations begins to run on the occurrence of the tortuous act or omission. The parties agree that they are bound by the *Beasley* interpretation of the statute of limitations.

9

the act is committed." *System Dynamics Int'l, Inc. v. Boykin,* 683 So. 2d 419, 421 (Ala. 1996) (quoting *Garrett v. Raytheon Co.,* 368 So. 2d 516, 519 (Ala. 1979)).

### B. The Defamation Claim

To prevail on a claim of defamation, a plaintiff must prove that a defendant intentionally made an unauthorized, unprivileged, false statement about the plaintiff to a third party, which injured the plaintiff's reputation in the eyes of his friends or the community and proximately caused the plaintiff to suffer damages. Alabama Pattern Jury Instructions ("APJI") 23.00. Slander *per se* is committed when the oral communication to a third person falsely and maliciously imputes to the plaintiff an indictable offense involving infamy or moral turpitude. *Id.* 23.02.

Alabama recognizes an absolute privilege for communications made during legislative or judicial, or quasi-judicial proceedings. *See Mead Corp. v. Hicks,* 448 So. 2d 308 (Ala.1983); *Webster v. Byrd,* 494 So. 2d 31, 33-34 (Ala. 1986). An absolute privilege protects

> ... slanderous statements made by parties, counsel, or witnesses in the course of judicial proceedings. . . . In questions falling within this absolute privilege the question of malice has no place. However malicious the intent, or however false the charge may have been, the law, from considerations of public policy, and to secure the unembarrassed and efficient administration of justice, denies to the defamed party any remedy through an action for libel or slander. This privilege, however, is not a license which protects every slanderous publication or statement made in the course of judicial proceedings. It extends only to such matters as are relevant or material to the litigation, or, at least, it does not protect slanderous imputations plainly irrelevant and impertinent, voluntarily made, and which the party making them could not reasonably have supposed to be relevant.

*Walker v. Majors,* 496 So. 2d 726, 729 (Ala. 1986) (quoting *O'Barr v. Feist,* 296 So. 2d 152, 157 (Ala. 1974)).

The *Majors* case involved a realtor defendant who, in a letter returning the earnest money of two prospective purchasers, stated: "I am filing suit against the Walkers for breach of their contract with me and to recover for the damages I have suffered as a result of their fraudulent conduct." *Majors,* 496 So. 2d at 728. Copies of the letter were sent to the defendant's lawyer and the plaintiffs. The predicted lawsuit followed. Thereafter, the plaintiff filed an action for defamation against Majors. The trial court granted summary judgment to defendant Majors. On appeal, the Alabama Supreme Court affirmed and held that <u>a defamatory statement made even before the commencement of a lawsuit</u> is <u>absolutely privileged if</u> the statement is <u>relevant</u> or material to the contemplated lawsuit. *See Barnett v. Mobile County Personnel Bd.,* 536 So. 2d 46 (Ala. 1988).

Absolute privilege enjoys vitality in the context of bankruptcy proceedings. In *Friedman v. Alexander,* 79 A.D.2d 627 (N.Y. App. Div. 1980), the defendant, as chief operating officer of a bankrupt corporation, sent defamatory letters about a creditor and its president to members of creditors' committees. When the creditor and its president brought a defamation action, the court held that absolute privilege barred the action. It observed that a bankruptcy proceeding is a judicial proceeding, that the defamatory statements were made in the context of the ongoing proceeding, that the contents of the letters were pertinent to the proceeding, and that the letters were directed only to parties legitimately involved in the proceeding. *See Zatkin v. Cornell,* 279 N.Y.S.2d 934 (N.Y. S.Ct. 1967).

Alabama also recognizes the doctrine of conditional privilege:

> Where a party makes a communication, and such communication is prompted by duty owed either to the public or to a third party, or the communication is one in which the party has an interest, and it is made to another having a corresponding interest, the communication is privileged, if made in good faith and without actual malice. *** The duty under which the party is privileged to make the communication need not be one having the force of legal obligation, but it is sufficient if it is social or moral in its nature and defendant in good faith believes he is acting in pursuance thereof, although in fact he is mistaken.

*Webster*, 494 So. 2d at 36 (quoting *Willis v. Demopolis Nursing Home, Inc.,* 336 So. 2d 1117, 1120 (Ala. 1996) (quoting *Berry v. City of New York Ins. Co.,* 98 So. 290, 292 (1923)).

Actual malice may be shown by evidence of previous ill will, hostility, other actions, or by the violence of the defendant's language.

Whether a defamatory statement is privileged is a question of law. *Webster v. Byrd*, 494 So. 2d 31 (Ala. 1986).

### III. Analysis

Clement is entitled to judgment as a matter of law on Borden's claims for breach of fiduciary duty, violation of the Attorney's Oaths codified in § 34-3-20 and § 34-3-15 of the Code of Alabama, violation of the Alabama Rules of Professional Conduct, and wantonness/malice arising from the attorney-client relationship. Under Alabama law, these causes of action do not exist against a provider of legal services.

#### A. The Malpractice Claim and the Statute of Limitations Defense

Disputed factual issues preclude summary judgment on Borden's legal malpractice

claim. The evidence, reasonably viewed in a light most favorable to Borden, shows that Clement simultaneously represented DABCO and Borden in the bankruptcy proceeding. It is clear beyond doubt that Clement represented Borden in non-bankruptcy matters at all material times. And on November 18, 1991, <u>Clement filed a document with the Bankruptcy court in which he successfully sought to be relieved from representing Borden in Borden's personal bankruptcy case!</u> There would have been no need for such document if Clement had not represented Borden in Borden's personal bankruptcy case.

While no one can deny Clement's fiduciary obligations to DABCO and its creditors, those obligations did not relieve Clement of his duty to exercise reasonable care when dealing with his other client, Borden. They did not relieve him of the obligation to act prudently when dealing with clients whose interests conflicted.

While Clement is not entitled to summary judgment on the merits of Borden's legal malpractice claim, the undisputed facts entitle Clement to judgment as a matter of law on his statute of limitations defense. No one denies that on October 9, 1991, Clement turned over the Flippo notes to Anderson and that Borden discovered this fact a few weeks later. The cause of action accrued on October 9, 1991, since that is the date on which the allegedly tortuous act was completed. This lawsuit was filed twenty days beyond the two-year statute of limitations—October 29, 1993.

### B. The Defamation Claim

It is disputed whether Clement's "criminal conspiracy" comment was false, injured Borden's reputation, or caused him to suffer damages. It is undisputed that the comment was

not consented to by Borden, and that Clement intentionally made the statement. Thus, privilege is the only basis on which Clement may be entitled to summary judgment on Borden's defamation claim.

Clement's "criminal conspiracy" comment was made in the context of both an ongoing bankruptcy proceeding and two separate adversary proceedings between McMillan and Borden/DABCO. Three months earlier, Borden and McMillan had negotiated a settlement of their adversary proceedings. The November 1, 1991, meeting was definitely related to the *bona fides* of that settlement, which had not then received the requisite court approval. No one can seriously contend that the "criminal conspiracy" comment was unrelated to the court proceedings; quite to the contrary, it was directly related to a perceived attempt by Flippo and Borden to perpetrate a fraud on the Bankruptcy Court. The statement was made only to persons involved with the bankrupt estates.

Under these circumstances, the defamatory criminal conspiracy statement is protected by absolute privilege as a matter of law.

In the alternative, the defamatory statement is protected by conditional privilege. The duty which Clement owed to DABCO and to its principal creditor is equal to his duty to Borden. The defamatory statement was made in the context of Clement's duty as the court-appointed attorney for DABCO. Clement's apparent hostility towards Borden arising from Borden's earlier accusation of fraud might ordinarily be enough to infer the requisite malice sufficient to defeat conditional privilege. But Clement's defamatory statement reflected not only his personal opinion; it mirrored the independent

14

assessments of three other principals who had no "bone to pick" with Borden: 1) DABCO's long-time Vice-President and Secretary-Treasurer, 2) the attorney for DABCO's largest creditor, and 3) <u>Borden's principal attorney in his personal bankruptcy proceeding</u>. As a matter of law, Clement's defamatory statement arose from his good-faith belief that, in fact, a criminal conspiracy existed. The statement was not made to anyone outside the judicial proceeding; and reflected the sentiment of all those who heard it, except Borden and Flippo.

The challenged statement was conditionally privileged.

### Conclusion

The Plaintiff's legal malpractice claim is barred by the statute of limitations. His defamation claim must fail because of absolute and/or conditional privilege. All of his other causes of action are not authorized by the law of Alabama.


By separate order, summary judgment will be granted for the Defendant.


Done this 29th day of March, 2001.

                                                          Chief United States District Judge
                                                          U.W. Clemon